[No. A048296. First Dist., Div. Two. Mar. 23, 1993.]

MILTON ESTES et al., Plaintiffs and Respondents, v.
JAMES ROWLAND, as Director, etc., et al., Defendants and Appellants.

510

512

COUNSEL

Daniel E. Lungren, Attorney General, and Paul D. Gifford, Deputy Attorney General, for Defendants and Appellants.

Richard Denatale, Edward Chen and Donald Specter for Plaintiffs and Respondents.

OPINION

KLINE, P. J.—The California Department of Corrections and the director of the department, James Rowland (hereinafter collectively the Department), appeal a trial court injunction that limits the Department's ability to conduct

random searches of prison visitors' vehicles on prison property. The Department asserts the injunctive conditions effectively prevent it from conducting the vehicle searches, and maintains the injunction is contrary to settled authority holding that prison visitors consent to searches of their vehicles while on prison property. The Department further complains the injunction was premised on stale evidence that did not reflect the practices in effect at the time of trial, and argues the searches ought to be upheld as proper administrative searches. In their cross-appeal respondents assert the searches are unlawful and must be terminated.

## STATEMENT OF THE CASE

On February 26, 1986, respondents filed a verified complaint for injunctive and declaratory relief challenging the Department's program of searching prison visitors' vehicles for narcotics and other contraband. They sought a preliminary injunction, which the Department opposed.

The complaint alleged five causes of action, and asserted violations of visitors' rights under the Fourth Amendment of the United States Constitution, article I, section 13 of the California Constitution, Penal Code sections 2600 and 2601 and administrative regulations.

Following a hearing on respondents' motion for a preliminary injunction the court concluded *Mathis* v. *Appellate Department* (1972) 28 Cal.App.3d 1038 [105 Cal.Rptr. 126] required it find the searches were conducted pursuant to the visitors' consent. However, the court held the Department was required to permit visitors who refused the search to leave prison premises without returning that day. The court thus filed an order that granted in part and denied in part respondents' requested preliminary injunction.

On May 3, 1988, the Department filed a notice of motion for summary judgment, which was opposed by respondents. After a hearing the court denied the motion on June 30, 1988.

After a one-month trial, the superior court entered a judgment recognizing the Department's legitimate interest in searching visitors' vehicles to stem the flow of drugs and other contraband into the prisons; however, it noted its concern about apparent abuses in the program. Accordingly, the court imposed a number of restrictions designed to cure the problems it discerned.

*The Court's Decision*

In determining whether the searches qualified as valid administrative searches the court analyzed whether they met the requirements of *McMorris*

v. *Alioto* (9th Cir. 1978) 567 F.2d 897, 899 [53 A.L.R. Fed. 881].
■ Under *McMorris*, a legitimate administrative search (1) must be clearly necessary to a vital governmental interest; (2) must be limited, and no more intrusive than necessary to accomplish the governmental interest; (3) must be reasonably effective in accomplishing its purpose; and (4) must be conducted for a purpose other than the gathering of evidence for criminal purposes.

The court concluded the first and third requirements had been met. However, with respect to the second criterion, the court observed that while some institutions had "maintained a policy of care and consideration toward the visitors," the treatment of other visitors "has bordered on the abhorrent." Finally, the court concluded the fourth *McMorris* condition had been met in most instances, but "grossly abused" in others. In sum, the court determined that although the evidence showed the existing search policies and practices were flawed, it concluded that if the searches were conducted in accordance with the court's injunctive conditions they would qualify as proper administrative searches under *McMorris*. Accordingly, the court imposed the following conditions:

1. All persons eligible to visit inmates must be mailed written notice (in both English and Spanish) of the dog search policy, the reasons for the policy, and the consequences of finding contraband in the vehicle or on the person of a prison visitor.

2. Immediately prior to a proposed search the driver of each vehicle must be informed orally and in writing (again, in both English and Spanish) of what the search will entail, the reasons for it, and the consequences of finding contraband. The notice must advise the driver that he or she has the option of leaving and returning without the car without losing visiting privileges for that day. Searches may be conducted only after written consent for the search is first obtained from the driver.

3. If the driver decides to leave, passengers may stay and cannot be denied their visit.

4. Local police officers may not be involved in the search process, and may not be present at the search unless there is some valid reason for their presence. Violations of the Vehicle Code may not be reported to any law enforcement agency.

5. No vehicle may be delayed more than 10 minutes prior to the search.

6. The search itself may last no longer than 10 minutes. If the drug-detecting dog indicates the presence of drugs the search may be extended by

five minutes. If contraband is found during the search and is packaged in a manner suggesting it was intended to be smuggled into the prison, additional time for further searches, including unclothed body searches, may be taken.

7. Dogs must be kept at least 20 feet from visitors at all times.

8. There may be no reading of books, letters or other documents in possession of visitors that are not reasonably suspected of being contraband.

9. No visitor may be strip-searched solely on the basis of a positive dog alert unless drugs are found in the vehicle. In the event of a strip search the visitor must be notified orally and in writing of the reason for the search.

10. If contraband is found the visit may not be denied unless the contraband was packaged in a manner suggesting it was intended to be smuggled into the prison.

11. No Department employee may damage or soil the visitors' possessions. If any possessions are removed from any portion of the vehicle they must be returned to the same location at the end of the search.

12. The Department must adopt regulations encompassing the conditions and must distribute them to all institutions prior to any future search.

13. The court retained jurisdiction to enforce and supervise the implementation of these conditions and, if necessary, to appoint a monitor to act on behalf of the court.

## STATEMENT OF THE FACTS

Prison officials testified that drugs are the central problem confronting California prisons. They described how drugs contribute to prison violence because various gangs fight over control of the drug trade in a particular area. Moreover, an inmate with a drug debt he cannot pay may be attacked or killed. Inmates and their families are sometimes forced to participate in drug smuggling under threat of physical harm.

Because existing search procedures were inadequate to detect drugs, prison officials decided to employ drug-detecting dogs to search visitors' vehicles. In December 1984 a dog-assisted search was conducted at the Correctional Training Facility at Soledad using dogs provided by the United States Customs Office. Every car was searched and a "considerable amount" of narcotics discovered. Due to the success of its experiment, the Department purchased two dogs that were first employed at Soledad in August

1985. The dogs were not only used to inspect vehicles, but to search work and recreation areas and living units within the prison.

David Reaver, president of a private company that trains dogs used by the Department, testified that the animals are trained to detect marijuana, heroin, cocaine and their derivatives. According to Reaver, a dog's olfactory ability is "at least a million times better" than that of a human. Reaver explained that his dogs are trained to "pinpoint" the precise spot where drugs are detected and should only require one and one-half to two minutes to complete a car search. Trained dogs are capable of detecting the odor of drugs on a car seat even after the drugs are removed, and can detect the odor of drugs on a seat even if the drugs were hidden in a body cavity of the person who had previously been sitting there.

The prison searches at issue follow a similar format. At the entrance to each prison a sign is posted warning that possession of weapons, alcohol or drugs on prison property is a felony. On the day of a search a prison staff member advises incoming cars that a random vehicle search is being conducted using dogs trained to detect narcotics. Visitors are told they may decline the search and leave the grounds, but that they will lose the chance to visit that day. As vehicles approach the prison, randomly selected cars are directed to the search area. All occupants are obliged to leave the car and directed to a table on which they must place their personal belongings in a basket for inspection. A staff member obtains identifying information from the driver and records the date, time and results of the search.

Once the occupants of the car exit the vehicle the dog search begins, and normally takes only a few minutes. At some prisons, the search ends if the dog does not find anything; at other prisons correctional officers conduct a manual search regardless of the results of the dog's search. If the dog alerts to the presence of narcotics, but none are discovered, the visitor may be asked to submit to an unclothed body search. If the visitor does not consent to such a search he or she is denied a visit for that day.

If drugs are discovered on a visitor or in a car, the visitor is generally arrested or referred to local law enforcement. If weapons are discovered the visitor may be arrested or cited, and may be denied a visit for that day. When the search reveals alcohol the visitor may be arrested or cited, or may simply have the alcohol confiscated and then be allowed to visit.

Numerous prison visitors testified about their experiences with the vehicle search program. Karen Morrison-Stewart testified that on March 30, 1985, she and her nine-year-old son went to San Quentin prison to visit her

husband. As she approached the prison she was directed into an overflow parking lot. Although she repeatedly asked what was happening, none of the officers offered an explanation and none sought her consent to be searched.

Ms. Morrison-Stewart and her son were told to assume a searching stance and exposed to a leashed dog. Despite the correctional officer's attempts to restrain the dogs, a dog approached her and touched its nose to her clothes. Ms. Morrison-Stewart and her son were left standing in the cold damp weather for approximately 10 minutes while their sweaters, jackets and shoes were thoroughly searched by prison personnel. An officer searched her purse and examined personal items such as credit cards, photographs and makeup. During the search the officers broke a speaker cover, left the contents of a bag of trash lying on the floor of the car, and ripped open sealed sterilized items in a first aid kit. No contraband was discovered.

Ms. Morrison-Stewart testified that after the search her son was too frightened to visit his stepfather again. As a result, Ms. Morrison-Stewart could only visit once a week, rather than twice, because she could not arrange for someone to watch her son twice a week.

Kerry Guardiola testified that on December 19, 1987, she drove to Soledad prison to visit a friend. She was directed to a carport area where guards wearing a "combat type uniform" were waiting. She was not asked for permission to search, and was not told she could refuse to be searched. A leashed dog was brought within a foot of her and sniffed at her body. The officers began searching her car and had a dog search the car. The officers removed bags of Christmas presents and opened sealed toys Ms. Guardiola had purchased for her children.

Susan Ricker went to visit her boyfriend at Chino East on January 19, 1988. As she approached the prison she was directed to pull off the road. A correctional officer told her she had consented to a search and that they were going to conduct a search that day.[1] The officers did not seek permission to search, did not explain the need for the search and did not inform Ms. Ricker that she could refuse the search and leave the prison grounds. Ms. Ricker testified she was in the process of moving and had dresser drawers full of clean clothes which the officers inspected and dropped onto the ground.

Other visitors testified regarding the searches they experienced. In one instance the discovery of an unopened bottle of champagne prompted an arrest, a strip search and a two-week denial of visiting privileges while the

---

[1] Prior to the search Ms. Ricker had signed a form consenting to a vehicle search before prison visits.

alcohol possession charge was processed. During another search, the dogs became excited after sniffing a visitor's purse. Although the visitor accounted for the dogs' interest by explaining that her purse was stored near meat in a butcher shop, she was subjected to a strip search and body cavity inspection. No contraband was discovered. Some witnesses testified they felt frightened, violated and invaded by the search process and complained the guards were rude and treated them disrespectfully. Other witnesses acknowledged the officers were polite and "pleasant" during the search.

Raymond Procunier, who worked for over 40 years in the field of corrections, and had been director of the Department, testified for respondents. He believed the dog search operation was flawed in many respects, complaining the procedure is not effective enough in curtailing smuggling to justify "running over the rights" of prison visitors. He believed the Department exaggerated the problem of contraband in prison parking lots. In his view, if prisoners regularly received contraband in the parking lots the Department should simply deny inmates access to those areas. Procunier testified contraband could more effectively be intercepted, without intrusion to visitors, through better postvisit searches of inmates and more extensive use of dogs inside prisons. According to Procunier, the visitor searches violate both Department regulations and the regulations of San Quentin, each of which require some reasonable suspicion before a visitor may be searched. He also testified that the gross amount of contraband intercepted is not an effective measure of the program's success, since most of the contraband seized from visitors was not designed to be smuggled into prison.

## Discussion

### I.

The Department first contends the court erred in denying its motion for summary judgment because, by entering prison property, prison visitors consent to the search of their person, property and vehicles. In *Mathis* v. *Appellate Department, supra,* 28 Cal.App.3d 1038, 1040, the court considered whether "the state or its agencies may validly establish as a condition to entry into a parking lot which is part of a custodial facility that the vehicle be subject to search." The court concluded that when individuals enter prison property after passing a sign that notifies visitors that entering vehicles are subject to search, they "may reasonably be deemed to have consented to search . . . ." (*Ibid.*)

The Department emphasizes that all state prisons have posted at their entrance a sign warning visitors they are entering prison property; that drugs,

weapons and other contraband is prohibited; and that their entry onto prison property is deemed consent to search their person, property and vehicles. The Department claims that, in light of this warning, the court was required under *Mathis* to hold the Department's searches were consensual, and thus grant its motion for summary judgment. We disagree.

First, as a factual matter, *Mathis* does not completely legitimate the kind of searches challenged in this case. While *Mathis* determined that consent could be presumed after visitors pass a sign warning of a potential search, the opinion does not discuss the nature of the searches that can legitimately be conducted pursuant to such implied consent. There is nothing in *Mathis* to suggest that vehicle searches employing intimidating narcotic-detecting dogs and the possibility of strip searches could be premised on the implied consent found in that case.

The Department alternatively maintains the dog searches were proper administrative searches. ▇ An administrative or regulatory search is one "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime." (*United States* v. *Davis* (9th Cir. 1973) 482 F.2d 893, 908.) ▇ Such searches are permissible under the Fourth Amendment "though not supported by a showing of probable cause directed to a particular place or person to be searched." (*Ibid.*; see also *United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593] [upholding search of firearms dealer's storeroom under Gun Control Act of 1968]; *Wyman* v. *James* (1971) 400 U.S. 309 [27 L.Ed.2d 408, 91 S.Ct. 381] [receipt of welfare benefits can be conditioned on recipient's consent to periodic home visits by caseworker]; *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830] [upholding airport screening procedures].) Administrative searches may be conducted without probable cause in part because they usually involve "less of an intrusion on personal privacy and dignity than that which generally occurs in the course of [a] criminal investigation." (3 LaFave, Search and Seizure (2d ed. 1987) § 10.1(b), p. 607.) Furthermore, administrative or regulatory searches are often conducted under circumstances where the burden of obtaining a warrant would frustrate the governmental purpose behind the search. (*Id.*, § 10.1(c), at p. 609.)

▇ Witnesses for both sides agreed that the presence of contraband (particularly narcotics) in California's prisons is a grave and urgent problem. Daniel McCarthy, former director of the Department and a named defendant, testified that the presence of narcotics in prisons is "the major problem" confronting correctional officers and administrators. He stated that narcotics is the main cause of violence in California's prisons. The problem also

affects communities outside prison, he explained, since friends and relatives of inmates may be coerced into illegally acquiring drugs if the inmate is threatened with violence or death within prison if his visitors fail to smuggle drugs to him. Mr. McCarthy testified that, nationwide, correctional administrators agreed that visitors were the main source of contraband within prisons. According to him, conventional visitor screening techniques cannot discover contraband secreted in undergarments or body cavities, as is often the case. Respondents' witness, Raymond Procunier, also a former director of the Department, acknowledged that the presence in prisons of drugs and weapons presents a "serious threat" to prison security. He stated that some inmates may get violent when on drugs, and others may be hurt or killed if they fail to pay a drug debt. Mr. Procunier described how visitors can smuggle drugs into even maximum security prisons and then pass the contraband on to prisoners.

 █ In assessing the reasonableness of an administrative search we must " 'balanc[e] the need to search against the invasion the search entails.' " (*People* v. *Hyde, supra,* 12 Cal.3d at p. 166, quoting *Camara* v. *Municipal Court* (1967) 387 U.S. 523, 536-537 [18 L.Ed.2d 930, 940, 87 S.Ct. 1727].) █ The need to search was established in this case by the undisputed testimony concerning the severity of the drug problem and evidence that traditional search or inspection methods could not adequately curtail the importation of drugs into the prisons. Against this need we balance the inconvenience to visitors—the majority wholly innocent of any wrongdoing—who wish to visit friends or relatives in prison. While dog searches of vehicles may be intrusive, we cannot ignore the fact that visitors knowingly and voluntarily enter an area necessarily subject to a level of security unmatched in any other part of our society. (4 LaFave, Search and Seizure (2d ed. 1987) § 10.7(b), p. 43 [proceeding in the face of known possible search bears on reasonableness].) While we doubt that the type of invasive searches involved here would be justified in many other situations in which administrative searches have been upheld, the level of drugs and violence in our prisons convinces us that these visitor searches, though in some ways unprecedented, may be conducted as proper administrative searches. Moreover, as intrusive as they are, random dog searches of vehicles do not approach the intrusiveness of the strip searching of all prison visitors condemned in *Blackburn* v. *Snow* (1st Cir. 1985) 771 F.2d 556.

As the trial court apparently recognized, however, characterizing the searches as "administrative" does not end the inquiry. Even if the searches were authorized as regulatory searches, the court was authorized, and indeed obligated, to analyze the manner in which the searches were conducted to insure constitutional safeguards were being met. █ "To pass constitutional muster, an administrative search must meet the Fourth Amendment's

standard of reasonableness. . . . [¶] To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." (*United States* v. *Davis, supra,* 482 F.2d 893, 910, fn. omitted; *Ingersoll* v. *Palmer* (1987) 43 Cal.3d 1321, 1329 [241 Cal.Rptr. 42, 743 P.2d 1299] ["The touchstone for all issues under the Fourth Amendment and article I, section 13 of the California Constitution is reasonableness."]) Thus, for example, although the court in *Davis* determined that airplane passengers are deemed to have consented to the customary preboarding search,[2] it nonetheless recognized the need under the Fourth Amendment to examine the reasonableness of the search procedure. (482 F.2d at pp. 908-912.) Similarly, in *McMorris* v. *Alioto, supra,* 567 F.2d 897, 901, the court determined that courthouse visitors impliedly consent to search, yet concluded the search nonetheless must be limited and reasonable.

■ In this case the trial court refused to grant summary judgment because it concluded there were at least three substantial contested issues: (1) whether the drug smuggling by visitors to inmates constitutes an issue of "grave governmental concern"; (2) whether the searches are an effective method of addressing this concern; and (3) whether the searches are conducted in a way to minimize interference with individual liberties.[3] Because these issues were all crucial to a determination of whether the challenged searches were legitimate regulatory searches, the motion for summary judgment was properly denied.[4]

---

[2]In this respect, the court observed, "a prospective passenger has a choice: he may submit to a search of his person and immediate possessions as a condition to boarding; or he may turn around and leave. If he chooses to proceed, that choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, is essentially a 'consent,' granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment." (482 F.2d at p. 913.)

[3]The Department argues the court's order denying their motion for summary judgment was flawed because it did not fulfill the requirements of Code of Civil Procedure section 437c, subdivision (g). That statute provides that, when denying a motion for summary judgment on the ground that a triable issue of fact remains, the court must (1) specify one or more material facts at issue; and (2) specifically refer to the evidence in support of and in opposition to the motion that indicates such a triable issue exists. While the court's order does specify the triable issues involved, it does not refer to the evidence demonstrating such issues exist.

It is sufficient for us to observe that the Department never objected to this error below, and thus never permitted the trial court to remedy this easily correctable problem. Under such circumstances, we will not entertain this objection on appeal.

[4]The Department apparently recognizes that, even if the searches were consensual, the court was obligated to review the constitutionality of the search procedures. Acknowledging that the posting of warning signs does not permit it to "subject visitors to any type of search, no matter how intrusive, without cause," the Department contends visitors' implied consent permits it to subject visitors to reasonable regulatory searches. It is obvious that in order to

## II.

The Department moved *in limine* to limit the evidence to events that occurred no more than two years prior to trial. The court denied this motion. ■ The Department now contends the court erred in issuing an injunction based on evidence of searches conducted long before trial and asserts an injunction must be founded on evidence of abuses existing at the time of trial. (*Rosicrucian Fellowship* v. *Rosicrucian Etc. Ch.* (1952) 39 Cal.2d 121, 135 [245 P.2d 481].)[5] In particular, the Department complains the injunction was improperly premised on testimony concerning abuses involved in the early searches during 1985 and 1986 that, it asserts, have been largely corrected.

While injunctive relief may not be proper when all past abuses have been remedied, courts have held that such relief may be granted where past practices have been stopped in anticipation of suit, and may be resumed if there is no injunction to prevent it. For example, in *Fisher* v. *Koehler* (S.D.N.Y. 1988) 692 F.Supp. 1519, the plaintiffs established Eighth Amendment violations at a New York correctional facility. Pointing to recent reforms, the defendants argued that injunctive relief was unnecessary. The court rejected this claim, explaining that " '[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption [of the abuses].' " (*Id.,* at p. 1565, citations omitted.) Similarly, in *U.S.* v. *Phosphate Export Assn.* (1968) 393 U.S. 199 [21 L.Ed.2d 344, 89 S.Ct. 361] the appellee asserted injunctive relief was unwarranted because the defendant association (which had allegedly committed antitrust violations) had been dissolved. The court noted that in order to avoid the injunction the burden was on *the defendant* to show the problem "could not reasonably be expected to recur." (393 U.S at p. 203 [21 L.Ed.2d at p. 349].)

While in this case there was evidence suggesting some of the most serious abuses had ended, substantial evidence proved some searches still exceeded constitutional limits. The court thus reasonably could have concluded injunctive relief was necessary to prevent the Department from continuing

---

determine whether the searches were indeed reasonable the court had to address the issues noted above, and could not properly dispose of the matter on summary judgment.

[5]*Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365 [122 Cal.Rptr. 732], which the Department cites in support of its position, is inapposite. In that case the complaint sought injunctive relief for acts committed in an election a year before the action was commenced. Because there was no evidence the defendants would repeat the acts the court denied injunctive relief. (49 Cal.App.3d at p. 373.) As we explain, the evidence regarding both *current searches* and past abuses supported the granting of injunctive relief in this case.

its current unconstitutional practices, or possibly resuming past abusive conduct.[6]

Furthermore, although the court permitted the presentation of evidence concerning the earlier dog searches, there was also substantial evidence concerning searches conducted during the two years prior to trial (and thus within the time frame the Department sought). Seven visitors testified about recent searches at five different facilities and correctional officers testified regarding the practices of the Department during that time. In addition, extensive documentary evidence detailed the search procedures followed at the various institutions. This evidence proved that while some of the early problems may have been corrected, some recent searches were still plagued by abuses, including overintrusiveness,[7] lengthy delays,[8] lack of consent,[9] unreasonable denial of visitation and misuse of dogs.[10] Thus, even disregarding the older evidence challenged by the Department, there was ample evidence from recent searches that provided a sufficient basis for the court's decision to impose the search conditions.

## III.

The Department contends that eight of the thirteen injunctive conditions imposed by the court unduly limit its ability to conduct proper administrative searches.[11] We agree with some of these contentions.

---

[6]As respondents note, the evidence of early abuses also was relevant because the Department opposed all injunctive relief, which would have allowed it to resume the abusive practices it had abandoned by the time of trial.

[7]In a 1988 search at Folsom a visitor was simply to be dropped off at the prison; the driver and his children were nonetheless detained for over an hour while their car and belongings were searched.

[8]There was evidence of hour-long searches at Soledad and San Quentin during 1987 and 1988.

[9]The court's decision noted that in some cases the consent form was signed after the search began, in other cases the form was given to the visitor after the search began and in some instances no consent form was ever given to the visitor even after a strip search was conducted.

[10]During a December 1987 search at Soledad, a dog was permitted to come within a foot of the visitor. During a search at San Quentin on August 6, 1988, one visitor reported the dogs were allowed to run free and come within "inches" of her; another witness testified that during his visit that day the dogs came within four feet of him and his wife.

[11]The Department does not challenge the conditions: (1) requiring written notice (in both English and Spanish) of the dog search policy to be provided all persons eligible to visit inmates, the reasons for the policy, and the consequences of finding contraband in the vehicle or on the person of the visitor; (2) permitting passengers to stay and complete their visit if the driver decides to leave; (3) prohibiting local law enforcement officers from being involved in or present at the search without valid reason and prohibiting the Department from reporting Vehicle Code violations to any law enforcement agency; (4) prohibiting the officers who

## A. *Notice Requirements*

■ The Department first maintains the court erred in requiring it to provide contemporaneous oral and written notice of the vehicle searches, and in ordering it to obtain written consent prior to the search. The Department also objects to the requirement that it advise visitors of the right to refuse the search without forfeiting that day's visit so long as they leave and return without their car.

The Department's objection to these conditions is baffling since in its trial brief it claimed visitors already were given the very notice it now seems unwilling to provide: the brief asserted that "visitors are informed that they have the right to refuse to be searched and to leave if they do not want to be searched." The trial court found otherwise, and concluded, "the evidence showed that most visitors were never told that they could leave, and others were denied the right to leave even if they wanted to." Further, there was evidence visitors were not advised of the purpose of the seaches and not informed of their right to refuse the search even after the court issued a preliminary injunction requiring that such advice be given.

The notice requirements imposed by the court were a proper device that increased the probability of acquiring informed and voluntary consent and enhanced the deterrent effect of the searches.

Unquestionably, providing visitors adequate notice of the search procedure and informing them of their right to refuse the search is essential to securing meaningful consent. ■ As the Department recognizes, the voluntariness of a person's consent depends on the "totality of all the circumstances" surrounding the grant of consent. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 227 [36 L.Ed.2d 854, 863, 93 S.Ct. 2041].) ■ Some searches were conducted in a coercive atmosphere, with guards wearing "combat gear" and restraining chained dogs. These conditions, combined with visitors' desire to see their friends and relatives, provided strong incentive for visitors to sign consent forms. When consent is granted without knowledge that it may be withheld, however, it raises serious doubts whether it is truly voluntary, particularly where, as here, the surrounding circumstances are intimidating.[12] (*United States* v. *Davis, supra,* 482 F.2d at p. 914 [knowledge of the right to refuse consent is to be taken into account in assessing voluntariness of consent].) To ensure that prison visitors receive

conduct the searches from reading books, letters or other documents possessed by visitors not reasonably suspected of being contraband; and (5) requiring the Department to adopt regulations implementing the conditions imposed by the court.

[12]In *McMorris* v. *Alioto, supra,* the court recognized that the consent given during administrative searches is a "qualified consent," insufficient to constitute the sort of voluntary

information adequate to support the grant of voluntary consent the court simply required the Department to do what it claimed it had been doing all along, i.e., advise visitors of the nature of the search and of their right to refuse the search.

The notice requirements presumably also advanced the key objective of the search (stopping the flow of contraband into prisons), since it is likely that after receiving notice visitors carrying contraband would leave, rather than risk search. (See *Ingersoll* v. *Palmer, supra,* 43 Cal.3d at p. 1336 [advance publicity of the sobriety checkpoint increases the deterrent effect of the roadblock].) The court was well within its discretion in imposing these notice requirements, which complement the prior written notice required to be mailed by the Department to all known persons eligible to visit inmates.

## B. *Time Limits*

■■■ The Department next contends the court improperly ordered that visitors may not be kept waiting more than 10 minutes, and that searches may not last more than 10 minutes (or 15 minutes if a dog alerts to the scent of narcotics). It complains the limits are "unworkable" and unnecessary for lawful visitor searches.

■ In *Ingersoll* v. *Palmer, supra,* 43 Cal.3d 1321, motorists challenged sobriety checkpoints that resulted in an average delay of 28 seconds (or 6.13 minutes if sobriety tests were administered).[13] (43 Cal.3d at p. 1327.) Our Supreme Court observed that the average time each motorist was detained was "critical" to minimizing the intrusiveness of the stop and justifying it as a proper administrative detention. (43 Cal.3d at p. 1346.) In this case the trial court properly recognized the importance of limiting the duration of both the wait and the searches and thus imposed time limits designed to prevent undue delays for the visitors while allowing sufficient time for complete searches.[14]

We agree that time limits were needed to avoid the unacceptably long delays and searches proven by the evidence. As a general proposition it

---

consent necessary to validate a warrantless, full-scale search for evidence of a crime. (567 F.2d at p. 901.)

[13]The Department notes the court did not feel the need to impose fixed time limits on the detention at issue in *Ingersoll* and thus suggest none were necessary here. It is equally likely, however, that the court did not impose specific limits in *Ingersoll* because the evidence proved the delays were already as brief and as minimally intrusive as possible.

[14]The evidence clearly supported the trial court's determination that such time limits were necessary. For example, time records show that many searches conducted at Folsom State Prison on March 18, 1989—three weeks before trial—took longer than twenty minutes, not counting waiting time.

seems to us entirely reasonable to require that a visitor not be kept waiting for search to commence more than 10 minutes from the time his or her vehicle is randomly selected to be searched. Similarly, we think it reasonable for dog searches ordinarily to be limited to ten minutes, given the expert testimony that a dog only requires one and one-half to two minutes to search a car. (See also *U.S.* v. *Taylor* (9th Cir. 1991) 934 F.2d 218, 220 [dog search of vehicle for drugs took "only a minute"].) At the same time, we recognize that unusual factors beyond the control of the Department may in particular instances render it impossible to commence or complete a dog search within the period prescribed by the court. A tired or otherwise distressed dog may refuse to cooperate with his handlers. Additional time may also be required in connection with the search of an unusual vehicle, such as a van or a motor home. In unusual situations such as these, where the exigency is not created by the Department, the search may exceed 10 minutes. In no instance, however, may the wait for search to commence or the search itself exceed 30 minutes.

■■■ The Department also claims it should not be limited to only an additional five minutes for the search if a dog alerts to the scent of narcotics. It argues that because a dog alert to the presence of drugs provides probable cause to believe contraband is in the car it should thereafter be permitted to search without a time limit. This point is well taken: courts have indeed recognized that an alert by a narcotic-detecting dog provides probable cause for a search. In *People* v. *Salih* (1985) 173 Cal.App.3d 1009 [219 Cal.Rptr. 603], customs officials opened a parcel from Thailand after a drug-sniffing dog reacted to the presence of narcotics. The court concluded that, "[o]nce alerted by the reactions of the dog, the customs officials had reasonable cause to suspect the international mail parcel might contain contraband and therefore they were authorized to open it." (*Id.*, at p. 1015.) Similarly, in *People* v. *Matthews* (1980) 112 Cal.App.3d 11 [169 Cal.Rptr. 263] the court upheld an inspector's search of a car, based on a trained dog's alert indicating the car contained narcotics. (*Id.*, at p. 21.)

In this case, once a dog alerts to the presence of narcotics the search is no longer an administrative search, confined by the limits of that doctrine, but a probable cause search limited only by "general principles of detention and arrest." (*Ingersoll, supra,* 43 Cal.3d at p. 1346 [once officer observes signs of driver intoxication further investigation is based on probable cause].) Because the Fourth Amendment imposes no fixed time limits on a search founded on probable cause, the court erred in limiting the time permitted for a search following a dog's alert to the scent of contraband. As such, that injunctive condition must be stricken.

The Department also complains the court erred in only allowing the search to be extended beyond the time limits noted if contraband is found *and* it is

packaged in a manner suggesting it was intended to be smuggled into prison. Respondents maintain this condition was justified because an administrative search must be " ' "strictly tied to and justified by" the circumstances which rendered its initiation permissible.' " (*People* v. *Hyde, supra,* 12 Cal.3d at p. 168.) According to respondents, the Department may only conduct searches that may discover contraband intended to be smuggled into the prison, since the dog search program assertedly was implemented for that limited purpose. Where contraband is discovered that is not susceptible to being smuggled, because of its size, weight or composition, respondents maintain the administrative objective of the search has been fulfilled, and the search may not be extended.

Respondents' position is premised on an excessively narrow interpretation of the administrative search doctrine. ■ We are not the first court to recognize that evidence of criminal activity unrelated to the purpose of the search may be disclosed by legitimate, limited administrative searches. The California Supreme Court has expressly concluded, however, that the discovery of such evidence "does not alter the fundamentally administrative character" of the search. (*People* v. *Hyde, supra,* 12 Cal.3d at p. 166; *Ingersoll* v. *Palmer, supra,* 43 Cal.3d at pp. 1331-1332 [airport screening procedure and sobriety checkpoint stops are administrative searches despite likely discovery of unrelated criminal activity].) Although the dog searches were conceived to discover contraband intended to be or least capable of being smuggled into prisons, they may unearth evidence of other criminal activity; under *Hyde* and *Ingersoll,* Department officials do not exceed the proper limits of an administrative search if they undertake further investigation based on the discovery of such evidence.

■ Moreover, because it is a crime to bring drugs onto prison property, regardless of how they are packaged (Pen. Code, §§ 4573-4573.6), peace officers cannot be limited when conducting a search incident to a valid detention or arrest based on such a violation. The discovery of such evidence provides probable cause to continue the search, limited only by relevant constitutional principles. Accordingly, the court's limit on such searches cannot stand.

C. *Distance Between Dogs and Visitors*

Paragraph 8 of the injunction requires that drug-detecting dogs be kept at least 20 feet from visitors at all times. ■ The Department contends this condition is "impracticable" and provides "fertile ground for future contempt proceedings based on observations of violations of the limit by visitors interested in the drug-detecting dogs' training and work."

Former director McCarthy testified he instituted a policy of keeping the dogs 20 feet away from visitors, but that this was done to prevent visitors from getting too close to the dogs, and not the reverse. Based on this testimony the Department asserts the policy was implemented to foster its administrative needs, and cannot be interpreted as evidence the Department recognized the need to keep the dogs a safe distance from visitors. Indeed, the Department refuses even to acknowledge the fear its drug-detecting animals may cause visitors and glosses over the testimony of numerous witnesses who expressed the great fear they and, in some cases, their children, experienced during the dog searches.

The Department seems to us unduly insensitive to the rights of visitors, which can be protected with little inconvenience to prison guards and without compromising the effectiveness of the search. "Neither administrative inconvenience nor lack of resources can provide justification for deprivation of constitutional rights." (*In re Grimes* (1989) 208 Cal.App.3d 1175, 1183 [256 Cal.Rptr. 690].) In this case the court simply ordered the Department to resume compliance with a condition previously imposed by a former director. The need for this condition was evident and the court acted properly by imposing it.

### D. *Unclothed Body Searches*

■ The Department objects to both paragraph 9 of the injunction, which prohibits requests for strip searches based solely on a positive dog alert, and the portion of paragraph 6 that permits strip search requests only if any contraband found is packaged in a manner demonstrating an intent to smuggle. Under the court's order, an unclothed body search may be conducted only "if drugs or narcotics are found in the vehicle and the contraband is packaged and located in a manner that would cause a reasonable person to believe that it was intended to be smuggled into the prison by that visitor." The Department argues this condition (1) unnecessarily limits the proper use of strip searches even when probable cause (provided by the dog alert) is present; and (2) imposes an "ill-defined limitation" on the searches based on the contraband's packaging and location.

### 1. *Paragraph 9*

The Department preliminarily contends that, even if a manual search of the vehicle does not unearth any drugs, it should be permitted to request a strip search based on a positive dog alert and that a visitor who refuses such a request may be denied visiting rights and compelled to leave.

In *Hunter* v. *Auger* (8th Cir. 1982) 672 F.2d 668, 674 [69 A.L.R. Fed. 841] the court considered the constitutionality of unclothed searches of prison

visitors based on uncorroborated anonymous tips that a visitor would be carrying contraband. The court concluded "the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions." (*Id.*, at p. 674.)[15] "To justify a strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience." (*Ibid.*) The Department argues a positive dog alert provides the "reasonable suspicion" necessary to at least justify a strip search *request.*

In support of its argument, the Department cites *United States* v. *Spetz* (9th Cir. 1983) 721 F.2d 1457, 1464, where the court concluded that a dog alert may provide sufficient probable cause for a search warrant. Relying on *Spetz*, the Department asserts that if a dog alert can provide the probable cause needed for a warrant, it necessarily must be sufficient to support a request to conduct an unclothed body search. In response, respondents rely on *Doe* v. *Renfrow* (N.D.Ind. 1979) 475 F.Supp. 1012, affd. 631 F.2d 91 (7th Cir. 1980), where the court concluded school officials had violated a student's constitutional rights by subjecting her to a strip search based only on a dog's alert.

The Department's argument is persuasive. If a positive dog alert provides sufficient probable cause to support a warrant, then it logically follows that such an alert provides a constitutionally reasonable basis for requesting an unclothed body search which, as we have noted, may be conducted based on the less demanding "reasonable suspicion" standard.

*Doe* v. *Renfrow, supra*, which involved egregious constitutional violations unmatched in this case, is limited in its application. In *Renfrow*, school officials conducted a school-wide search using drug-detecting dogs. Students were made to sit with their hands on their desks while dogs sniffed each child. After a dog seemingly alerted to drugs on a 13-year-old girl she emptied her pockets; when no drugs were found she was forced to submit to a strip search, which also failed to uncover drugs.[16] The court declared this search unconstitutional: "The continued alert by the trained canine alone is insufficient to justify such a search because the animal reacts only to the scent or odor of the marijuana plant, not the substance itself. . . . Therefore, the alert of the dog alone does not provide the necessary reasonable cause to

[15]The court noted that this standard is "flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers." (672 F.2d at p. 674.)

[16]The alert was later attributed to the fact that the girl had earlier played with her dog, which was in heat. (631 F.2d at p. 94.)

believe the student actually *possesses* the drug." (475 F.Supp. at p. 1024, italics in original.)

*Renfrow* is distinguishable. First, the children searched were not provided advance notice and an opportunity to refuse. Further, if a child was the focus of a dog alert, he or she was not simply requested to submit to a strip search, but compelled to do so. In comparison, the searches at issue here are conducted on the grounds of a state prison after substantial advance warning. Based on the trial court's injunction, most visitors will have received advance notification by mail of the possibility of search, further, no search is permitted until the visitor is provided contemporaneous oral and written notice of the search, and told of the right to refuse the search. Finally, if a dog alerts, but no contraband is found in the vehicle, officials only may ask to conduct a strip search; the visitor is free to refuse and leave the premises.

Not only is *Renfrow* factually dissimilar, but the opinion explicitly limits its misleadingly unqualified statement that the dog alert "does not provide reasonable cause to believe the student actually *possesses* the drug." (475 F.Supp. at p. 1024, italics in original.) In fact, the court signalled that its conclusion was motivated by the blatant violation of the students' rights, and observed, "[t]his Court can conceive of many situations where the alert of a trained dog alone can provide the necessary reasonable cause for a more complete but private body search." (475 F.Supp. at p. 1027.) In our opinion, a limited administrative search of prison visitors aimed at restricting the flow of contraband into a prison is among the unusual situations in which a strip search request (which, it must again be emphasized, can be refused) is justified based solely on a dog alert.

### 2. *Paragraph 6*

The Department also complains the court improperly limited unclothed body searches to situations where contraband is discovered *and* is packaged and located in a manner suggesting it was intended to be smuggled; it asserts that once contraband is found, a strip search may be requested regardless of its location or the form in which it is packaged.

The difficulty with this condition is that it is not always possible to determine whether contraband is intended to be smuggled. The Department concedes that possession of certain types of contraband that cannot easily be smuggled into a prison—a bottle of wine or six-pack of beer, for example— does not provide reasonable cause to believe that the possessor intended to smuggle it into the prison. For that reason, the Department acknowledges it would be unreasonable and unduly intrusive to subject a visitor to a strip

search simply because he or she was found in possession of a standard size and conventionally packaged alcoholic beverage or a similar item too large or unwieldy to be smuggled into prison.

The situation is very different, however, with respect to narcotics, the type of contraband of greatest concern to prison officials. Even though a package of drugs may be so large and unwieldy that it would be unreasonable to believe the possessor intended to smuggle the entire package into prison, a smaller portion could be brought into the institution by secreting it in a body cavity. Thus a strip search may be requested where the contraband discovered during the search, although not packaged in a manner suggesting the entire amount was intended to be smuggled, exists in a form that can be secreted on the person of a prison visitor.

## E. *Denial of Visitation*

The Department also challenges paragraph 10 of the judgment, which prohibits the denial of visitation for a visitor found with contraband unless the contraband is "packaged in a manner that would cause a reasonable person to believe that it was intended to be smuggled into the prison, or unless the contraband is found on the person of the visitor." The Department asserts that, as applied to narcotics, this condition constitutes a "gross invasion" of prison officials' power to safely manage penal institutions.

This condition is not only impractical, but improperly limits officials' right to investigate and arrest for violations of Penal Code sections 4573-4573.6. First, the condition suffers from the same problem as the strip search condition; although a large amount of drugs, pills or other forms of narcotics could not be smuggled into prison, it is reasonable to suspect that the possessor of such items intended to smuggle a smaller portion into the prison. Further, the condition is inconsistent with the duty of a peace officer to arrest a person in possession of contraband on prison premises.

## F. *Injunction to Prevent Mishandling of Evidence*

 The Department also claims that paragraph 11, which prohibits the mishandling or soiling of any visitor's property, and which requires the replacement of any inspected items, is improper and unnecessary. The Department maintains that if a visitor has property damaged or soiled during a search he has an adequate legal remedy, for he may file a claim for compensation with the Board of Control. Under these circumstances, the Department asserts, equitable relief is inappropriate.

 "[T]here is no right to equitable relief or an equitable remedy when there is an *adequate remedy at law.*" (11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 3, p. 681, italics in original); *Brownfield* v. *Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410 [256 Cal.Rptr. 240] [there must be an injury that "cannot be compensated by an ordinary damage award"].) Respondents maintain, however, that equitable relief is proper where damages are difficult or impossible to calculate. They also assert an injunction may issue where necessary to prevent a multiplicity of separate actions. (See 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, §§ 253, 255, pp. 220-221.) The present record does not show, however, either that damages will be difficult to calculate or that, in the absence of an injunction, numerous visitors will commence litigation seeking compensation for property damaged during searches.

Concededly, the record shows that Department officials executed some searches with, at best, casual and indefensible indifference to visitors' property. Nevertheless, the record simply does not demonstrate the inadequacy of existing legal remedies. For this reason, paragraph 11 of the injunction cannot stand. We reach this conclusion with the hope and expectation that those conducting the searches will, regardless of any continuing injunctive order, avoid unnecessary damage to visitors' private property and treat it with the respect it deserves. Furthermore, we must emphasize that our conclusion that equitable relief is now uncalled for, is based only on the inadequacy of the record before us; we do not foreclose the granting of injunctive relief by the trial court in the future upon a sufficient showing that Department officials are unwilling to treat visitors' property with proper respect in the absence of an injunctive order compelling them to do so.

## G. *Retention of Jurisdiction to Appoint Monitor or Master*

 Finally, the Department claims the court erred in retaining jurisdiction to appoint a monitor or master if necessary to supervise implementation of the court's order. It claims there is no "express authority for the court's jurisdiction to appoint a monitor."[17] Because the court has not yet appointed a monitor or master, but has only reserved jurisdiction to do so, we need not address the propriety of actually appointing a monitor or master in this case. At this point, we need only decide whether a trial court properly may reserve jurisdiction to ensure the parties comply with an injunctive order.

---

[17]A federal court has the " ' "inherent power [to appoint a monitor] for the administration of justice when deemed by it essential." ' " (*Ruiz* v. *Estelle* (5th Cir. 1982) 679 F.2d 1115, 1161, fn. 240, and cases there cited.) Apparently, no similar right has yet been explicitly recognized for California courts.

It is well settled that "[i]ndependent of statute, a court which renders an equitable decree may appropriately reserve jurisdiction to take steps to carry it into effect . . . ." (7 Witkin, Cal. Procedure, (3d ed. 1985) Judgment, § 81, p. 516.) The Department offers no authority to the contrary. The injunctive order in this case, " 'although purporting on its face to be permanent, is in essence of an executory or continuing nature . . . .' " (*Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 130 [135 Cal.Rptr. 192].) A court possesses the inherent power to reserve jurisdiction to ensure that its injunctive orders are carried out. The court below properly reserved jurisdiction for that purpose; we leave for another day the question whether appointment of a monitor or master is necessary or proper.

## IV.

In their cross-appeal respondents assert the prison dog search program is unlawful because it both exceeds the limits of a proper administrative search and violates Penal Code sections 2600 and 2601, subdivision (d), which guarantee prisoners the right to receive visitors.

Respondents maintain the dog searches exceed the previously recognized bounds of administrative searches because: (1) such searches are far more intrusive than searches previously sanctioned under the administrative search doctrine; (2) they are overbroad, in that they involve searches of items not intended to be brought into the prison; (3) prison officials are granted wide discretion regarding the specifics of each search; (4) they are surprise searches, while most administrative searches are conducted with advance notice; and (5) they are too often used for general law enforcement purposes.

While, as earlier observed, the searches in question are undeniably intrusive, we cannot agree that they are unlawful. As already explained, the court's judgment addressed respondents' legitimate concerns and imposed substantial limits on the search process that bring it within the parameters of the administrative search doctrine. Many of those conditions were acceded to by the Department. (See *ante*, fn. 11, p. 526.) This court leaves most of the challenged constraints intact. Thus, for example, the trial court placed reasonable time limits on the length of searches; restricted the breadth of permissible search by prohibiting inspection of personal papers that could not constitute contraband; and reduced the likelihood of surprise searches by requiring advance as well as contemporaneous notice of the dog search

program and permitting visitors the option of leaving.[18] In order to reduce the likelihood searches would be used for general law enforcement purposes, the court additionally prohibited the involvement of local police or other law enforcement authorities.

We do not believe the searches are unlawful simply because they exceed the limits of those approved by the courts in different contexts. It is true that the airport search approved in *People* v. *Hyde, supra,* 12 Cal.3d at page 169, and the sobriety checkpoint program reviewed in *Ingersoll* v. *Palmer, supra,* 43 Cal.3d 1321 were both shorter and otherwise less intrusive than the searches at issue here. However, with the use of metal detectors, small weapons can be discovered much more easily and more quickly than small quantities of narcotics secreted in a prison visitor's vehicle, clothes or body. Similarly, the initial stop for sobriety checks in *Ingersoll* lasted on average only 28 seconds because the screening officer was able in that short time to observe the driver for bloodshot eyes, alcohol on the breath or other obvious signs of impairment. (43 Cal.3d at p. 1327.) It is impossible to make a reasonably accurate assessment of whether drugs are present without conducting a more thorough, and necessarily longer search than those involved in *People* v. *Hyde* and *Ingersoll* v. *Palmer.*

Finally, and perhaps most importantly, the searches with which we are here concerned are not taking place in airports or on public streets, but on the premises of a maximum security prison. As the United States Supreme Court has recognized, "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." (*Pell* v. *Procunier* (1974) 417 U.S. 817, 823 [41 L.Ed.2d 495, 502, 94 S.Ct. 2800].) The evidence demonstrated that smuggling drugs and weapons is the central problem confronting prison administrators. Because visitor searches provide an effective (albeit imperfect) means to address this problem we are persuaded that, despite their intrusive nature, they qualify as administrative searches.

V.

Also in connection with their cross-appeal, respondents argue the searches are invalid because they violate Penal Code section 2600 and subdivision (d) of section 2601. Section 2600 provides that "A person

---

[18]While we recognize prison officials are still not required to give advance notice of the date of any particular search, the information required by the court's order to be given to visitors certainly helps alleviate the potential fear and annoyance caused by unannounced searches.

sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as are necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." Section 2601, subdivision (d), states that inmates have certain civil rights, including the right "[t]o have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution."

 The analysis of a claim under section 2600 requires a three-step inquiry: "(1) Are any 'rights' implicated? (2) If they are, does a 'reasonable security' problem exist which might permit a deprivation of rights under the statute? (3) If so, to what extent are deprivations of those rights 'necessary' to satisfy reasonable security interests?" (*In re Arias* (1986) 42 Cal.3d 667, 689-690 [230 Cal.Rptr. 505, 725 P.2d 664].)[19]

 The Department claims we need not go beyond the first question, because only visitors' rights, not inmates' rights, are affected by the dog search program. We disagree. Sections 2600 and 2601, subdivision (d) have been used to challenge restrictions that primarily affect visitors, but consequentially diminish inmates' visitation rights. For example, in *In re French* (1980) 106 Cal.App.3d 74 [164 Cal.Rptr. 800] the court considered the validity of prison policy providing that once a visitor refused a full body search, all future visits were both relegated to noncontact status and conditioned on a full body search. *In re Stone* (1982) 130 Cal.App.3d 922 [182 Cal.Rptr. 79] also involved the legality of imposing a blanket noncontact restriction on persons who once refused a body search. While the dog searches that are the subject of this case only directly affected visitors, they invariably resulted in shorter visits because the search consumed some of the time the visitors had intended to spend with an inmate. These delays were sometimes lengthy, especially in cases in which a full body search was conducted. Moreover, where contraband was discovered the planned visit was completely denied. Because the practical effect of the searches was to limit and, in some instances, cancel planned visits, it is plain that the dog search program implicates rights protected by sections 2600 and 2601, subdivision (d).

Under *Arias*, we must next determine whether there is a reasonable security problem that might justify such a deprivation of rights. The evidence demonstrates that the smuggling of contraband into California's prisons is a grave problem requiring unprecedented security procedures; this

---

[19]In *In re Arias, supra,* 42 Cal.3d 667, wards of the Youth Authority challenged the institution's right to install listening devices in the chapel of the school where they were being held.

evidence clearly supports the conclusion that prison administrators implemented the search program in an effort to deal with a very real and dangerous security problem.

The most difficult question is that posited by the third prong of *Arias*, that is, whether the deprivations are "necessary" to satisfy reasonable security interests. (*In re Arias, supra,* 42 Cal.3d at p. 690.) ▮▮▮ "If there is some less restrictive and equally effective means, other than the procedures challenged [ ], to promote the goal of preventing smuggling of contraband into [prisons], the challenged procedures are not necessary to the security of the institution and are proscribed by Penal Code section 2601, subdivision (d)." (*In re Bell* (1980) 110 Cal.App.3d 818, 822 [168 Cal.Rptr. 100].) "However, this test does not require 'prison administrators to establish procedures which would jeopardize institutional security solely because they provide a lesser restriction on [an individual's] rights. Courts have only required that if the goal of reasonable institutional security can be effectively promoted by several different means, the least restrictive one be chosen.' " (*In re Arias, supra,* at pp. 697-698, quoting *In re Stone, supra,* 130 Cal.App.3d 922, 929, fns. omitted.) It is prison administrators' burden to establish the absence of less intrusive means of meeting their security needs. (*Id.,* at p. 697, fn. 34.)

▮▮▮ Respondents complain the Department has failed to show that less drastic steps cannot satisfy its administrative needs. They offer a list of alternative procedures that assertedly could be used to curtail smuggling without imposing such an extreme burden on inmates' visitation rights. For example, they question why officials could not forgo random searches of visitors' cars and, instead, conduct strip searches and body cavity inspections on inmates after contact visits, increase monitoring of visiting rooms to detect smuggling or use dogs to regularly search cells and other areas inside the prisons. While some of respondents' proposed procedural changes could be used in conjunction with the current search practices to help curtail the smuggling of contraband, none addresses the problem at the same level as the dog searches. Most of respondents' proposals are aimed at detecting and seizing drugs that have made it into prison; the dog search program was designed to intercept drugs at an earlier point. The program also is an effective deterrent, since it discourages visitors from attempting to bring contraband into prison property. Even those not so dissuaded will have second thoughts about proceeding with a planned visit once informed a dog search is in progress.[20] Because none of the alternatives proposed by respondents responds to the problem in exactly the same way as the dog search

---

[20]Respondents assert the sporadic use of the dog search procedure undercuts the Department's argument that the searches are necessary. We disagree. Regardless of whether the dog

program, we have concluded the visitor searches were a justifiable component of a comprehensive program to deal with the problem of contraband in the prisons.[21]

CONCLUSION

The judgment is modified in accordance with the views expressed herein and, as modified, affirmed. Each party to bear its own costs on appeal.

Peterson, J.,* concurred.

BENSON, J.—I concur in the majority's comprehensive opinion in this matter. I write separately to express my concern with the broad language used by the trial court in the portion of its judgment retaining jurisdiction to appoint a monitor. The judgment provides "jurisdiction is expressly retained to appoint a monitor to act on behalf of the court, and to determine the precise duties of the monitor and provisions for compensation." The trial court's retention of jurisdiction to appoint a monitor "to act on behalf of the court" foreshadows a potentially unconstitutional delegation of judicial powers.

Unlike the federal courts, which have exercised what they have deemed their "inherent equitable power" to appoint monitors in prison reform cases (see *Ruiz* v. *Estelle* (5th Cir. 1982) 679 F.2d 1115, 1161; maj. opn., *ante*, p. 535, fn. 17), the power of California state courts to make such appointments

---

searches are used regularly they provide a strong deterrent to attempted smugglers, since a visitor never knows when he or she may be subjected to a search.

[21]Respondents also suggest the dog searches are barred by the Department's own regulation. Code of Regulations, title 15, section 3173(e) states that "Any person[s] coming onto the grounds of an institution, their vehicle and the articles of property in their possession are subject to inspection to whatever degree is consistent with the institution's security needs. Such inspections may include a search of a visitor's person, property and vehicle when there is substantial reason to believe the visitor is attempting to smuggle unauthorized items or substances in or out of the institution." According to respondents, this regulation permits summary inspections, but limits actual searches to situations where there is "substantial reason" to believe the visitor is involved in smuggling. Because the dog searches are not based on individualized suspicion, respondents assert they violate the Department's own regulation concerning the propriety of visitor searches. We disagree.

The Department's regulation concerns searches under the Fourth Amendment, and properly provides they may not be conducted without "substantial reason," i.e., probable cause, to believe the visitor is attempting to smuggle contraband. Because the regulation does *not* address the validity of searches conducted under the administrative search doctrine it cannot be interpreted as a bar to the dog searches involved here.

*Presiding Justice of the Court of Appeal, First Appellate District, Division Five, sitting under assignment by the Chairperson of the Judicial Council.

is much more narrowly circumscribed. The statutory and constitutional limitations in California state courts were carefully delineated by Justice Butler of the Fourth District in *Aetna Life Ins. Co.* v. *Superior Court* (1986) 182 Cal.App.3d 431 [227 Cal.Rptr. 460]:

 "The superior court has no power to assign matters to a referee for decision without explicit statutory authorization. (*In re Marriage of Galis* (1983) 149 Cal.App.3d 147, 150 [196 Cal.Rptr. 659]; *Bird* v. *Superior Court* (1980) 112 Cal.App.3d 595, 599 [169 Cal.Rptr. 530]; see generally, 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 48.)

"Particularly, the court has no power to make an unconsented-to general reference, which conclusively decides all or part of a matter, because not only is such a general reference not authorized except by explicit agreement of the parties ([Code Civ. Proc.,] § 638 . . .), but also, the California Constitution prevents delegation of judicial power except for the performance of 'subordinate judicial duties.' (Cal. Const., art. VI, § 22; see *In re Perrone C.* (1979) 26 Cal.3d 49 [160 Cal.Rptr. 704, 603 P.2d 1300]; *In re Edgar M.* (1975) 14 Cal.3d 727 [122 Cal.Rptr. 574, 537 P.2d 406].) Deciding a major legal issue in a case, which probably will determine liability, is not a subordinate judicial duty. The Supreme Court said in *In re Edgar M.* a referee can make a binding determination only in a consensual general reference. (*In re Edgar M., supra*, at p. 734; see [Code Civ. Proc.,] §§ 638, 644; *Estate of Hart* (1938) 11 Cal.2d 89, 91 [77 P.2d 1082].)

 "The statutes carefully preserve the distinction of special and general reference to comply with the constitutional mandate; a general reference has binding effect, but must be consensual, whereas a special reference may be ordered without consent but is merely advisory, not binding on the superior court. (See [Code Civ. Proc.,] §§ 644, 645; *Estate of Bassi* (1965) 234 Cal.App.2d 529, 536-537 [44 Cal.Rptr. 541]; 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, §§ 50, 51.)" (*Aetna Life Ins. Co.* v. *Superior Court, supra*, 182 Cal. App.3d at pp. 435-436.)

In this case, the Department of Corrections has strenuously objected to the appointment of a monitor. In light of this objection and the prohibitions on the delegation of judicial power just discussed, any future appointment of a

monitor in this case must ensure that all actions taken by the monitor are purely advisory in nature and not binding on the superior court.[1]

Peterson, J.,* concurred.

---

[1]The majority opinion observes that several injunctive conditions imposed by the trial court are not challenged by the department on appeal. (Maj. opn., *ante*, p. 526, fn. 11.) Apparently also unchallenged by the department is a $1,301,213.26 award of attorney fees and costs favoring respondents and their counsel. This award was rendered in an order dated November 1, 1991, of which we take judicial notice, and consists of the following: $1,053.674.21 in attorney fees, enhanced by a 1.1 multiplier of $105,367.42; $78,650.52 in costs; and $63,521.11 in attorney fees for pursuing the attorney fees and costs award. Significantly, the award of attorney fees and costs was rendered by the trial court before the important factor of plaintiffs' success in the litigation could be finally measured following appellate review (see *Sokolow* v. *County of San Mateo* (1989) 213 Cal.App.3d 231, 247-250 [261 Cal.Rptr. 520]), and its payment is to be borne by California taxpayers.

*Presiding Justice of the Court of Appeal, First Appellate District, Division Five, sitting under assignment by the Chairperson of the Judicial Council.