[Civ. No. 53136. First Dist., Div. One. Apr. 29, 1982.]

DEPARTMENT OF CORRECTIONS, Petitioner, v.
THE SUPERIOR COURT OF MARIN COUNTY, Respondent;
WARREN D. JORDAN, Real Party in Interest.

246

■■■■■■■■■■

■■■■■■■■■■

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Robert R. Granucci, W. Eric Collins and Paul D. Gifford, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Abigail R. Marshall, Carla H. S. Young and Donald T. Bergerson for Real Party in Interest.

OPINION

THE COURT*—The Department of Corrections seeks a writ of mandate compelling the Marin County Superior Court to vacate an order of June 19, 1981, which had reinstated "contact" visits at San Quentin State Prison between real party, Warren D. Jordan, and his attorney of record in then-pending superior court No. 7819. The contact visits had previously been terminated by prison officials. The superior court's order expressly applied only for the duration of the proceedings in No. 7819 and only to attorney-client visits in the context of Jordan's representation in the case.

We issued a temporary stay of the June 19 order on July 2, 1981, and an alternative writ on July 14, 1981. The matter was orally argued by petitioner and real party on November 23, 1981, and was submitted on that date.

Subsequently, trial in superior court No. 7819 was completed. Real party, Jordan, filed his notice of appeal from the judgment on January 12, 1982. On February 23, 1982, we concluded in an unpublished opin-

---

*Before Racanelli, P. J., Elkington, J., and Newsom, J.

■■■■■■

ion that since the trial was completed, the question of whether a peremptory writ of mandate should issue was moot.

We granted the Attorney General's March 4, 1982, request for rehearing on March 11, 1982, and have determined that an opinion on the merits in this instance is appropriate. (*Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 539 [170 Cal.Rptr. 25, 620 P.2d 612]; *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737].)[1]

The relevant procedural background follows:

Jordan was charged by information filed in Marin County Superior Court (Marin Super. Ct. No. 7819) with two counts of attempted murder (Pen. Code, §§ 664, 187) and two counts of aggravated assault by a life prisoner (Pen. Code, § 4500).[2] As to each of the four counts, he was alleged to have used a knife within the meaning of section 12022, subdivision (b), and was further alleged to have inflicted great bodily injury on his victims within the meaning of section 12022.7. The charges arose out of an incident on November 6, 1980, wherein Jordan allegedly assaulted a deputy district attorney and the chairman of the Board of Prison Terms at the conclusion of his parole eligibility hearing. The facts of the incident were alleged to include the smuggling of a stabbing instrument, a hacksaw blade and a handcuff key into the hearing room.

In response to a February 3, 1981, recommendation from Lieutenant Rohrer, a program administrator at San Quentin where Jordan is incarcerated, George Sumner, then warden of San Quentin, issued an order terminating all contact visits for inmate Jordan, including those with his attorney, Ms. Marshall.[3] Marshall had been appointed as Jordan's attorney of record in case No. 7819 on January 2, 1981, prior to his preliminary hearing.

---

[1]Both parties argued facts at oral argument which related to events subsequent to the June 19, 1981, order. We decline to consider such matters. Our sole concern is the propriety of the order on the record as of June 19, 1981.

[2]Unless otherwise noted, all statutory references are to the Penal Code.

[3]The various visiting arrangements for inmates and attorneys were described in a declaration of Lieutenant Powers, filed below, as follows: "Room A-4, the contact room, has an open slot in the plexiglass that separates the attorney and client. The slot allows free passage of materials. Attorney and client are locked in this room; staff may look in through a small window but there is no constant surveillance. Materials carried by the inmate are examined for contraband before he enters the room and after he leaves the room. [¶] Rooms A1, A2 and A3, the 'noncontact' rooms do not have open slots in the partition separating attorney and client. When an attorney wants to pass materials to his client the materials are placed in a tray which is in the corridor outside the rooms. The attorney may place the materials in the tray himself or may call an of-

On April 18, 1981, Jordan filed a motion in the superior court criminal case requesting that contact visits in the A-4 booth (see fn. 3) with Ms. Marshall be restored. Opposition was filed by the department on April 28, 1981. Both the motion[4] and the opposition included supporting declarations and exhibits. Notably, the department's response included declarations from prison officials.[5]

On May 6, 1981, apparently following a hearing at which no additional evidence was presented, Judge Wilson denied Jordan's motion without prejudice; however, on May 8, 1981, Judge Wilson issued a minute order declaring that the subject procedure for noncontact visits appeared to be almost precisely as that outlined in *Adams v. Carlson* (7th Cir. 1973) 488 F.2d 619, and constituted an unwarranted interference with an inmate's right to counsel "in the absence of some basis for a reasonable suspicion that the attorneys would smuggle contraband." Accordingly, Judge Wilson declared that the noncontact visiting arrangements must be changed to an A-4 type unless the state could make the showing required under *Adams.* The matter was then set for a

---

ficer to place the materials in the tray. The tray is pushed through an opening in the wall where an officer located on the inmate side of the wall retrieves them and carries them to the inmate. Legal materials are examined for contraband but are not read. The passing of materials by this method generally takes only a short while; it would be unusual for the process to take more than five minutes. [¶] Like the contact rooms, the noncontact rooms are private; that is, only the attorney and client are present in the room during consultations. One of the rooms (A-3) has a total of 6 phones and 6 seats and is used when there are multiple attorneys, multiple defendants, or when the attorney is accompanied by a licensed investigator or certified law student. The phone communications are confidential; the phone lines run only between or among the phones in the particular room. [¶] The procedures set out above have been in effect since before November 6, 1980. . . . [¶] In addition to A-4 room, San Quentin has at least two other highly secure areas known to counsel that could potentially be used for attorney-client contact visits. In the main visiting room, there are two caged areas used by appointment for personal contact visits by inmates in protective custody. These visiting cages are in the center of the room, in plain view of correctional officers located throughout the room. Thus, visitors in these areas are secured and isolated by iron cell bars, but always subject to visual surveillance of officers. [¶] Another area, not in the visiting rooms, are the 'old' 'A' and 'B' attorney rooms located near the board room area. These are high security cells which were used for attorney-client visiting with segregation inmates, but are no longer in use due to the construction of the new visiting area now in use."

[4]The motion and its accompanying declaration and points and authorities were not part of the exhibits filed with this court. We have augmented the record on our own motion to include them. (Cal. Rules of Court, rule 12(a).)

[5]The Department of Corrections did not object to the procedure in this case whereby its action was challenged in an ongoing criminal proceeding to which it was not initially a party. Although we need not consider such procedural irregularity, we observe that normally a state prison inmate may challenge the terms and conditions of confinement by filing a petition for habeas corpus.

hearing held on June 19, 1981. The Department of Corrections, represented by the Attorney General, produced the testimony of Warden Sumner and Lieutenant Rohrer. Both sides offered prison records as evidence concerning Jordan's history of violence and weapons possession within the prison. The department, while conceding inability to make the showing required by *Adams*, argued that *Adams* was not controlling, and presented evidence that the denial of Jordan's contact visits was within the prison officials' discretion under the authority of sections 2600, and 2601, subdivision (d).[6]

At the conclusion of the hearing, Judge Wilson ordered the department to reinstate Jordan's contact visits with Ms. Marshall in a setting similar to that provided in the former "A-4" room. This petition ensued.

## I.

Preliminarily, we note that the Attorney General has objected to Jordan's return to the alternative writ on the grounds that "it does not contain specific averments of facts and fails to conform to the rules applied to answers in civil actions." ▮ Jordan, on the other hand, observes that the return was verified, contained an affirmative factual statement and a declaration of counsel, and argues that the return is procedurally sufficient. We agree. (*Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 81, fn. 3 [112 Cal.Rptr. 777, 520 P.2d 1].)[7]

## II

Relying primarily on federal precedents (*Adams* v. *Carlson, supra,* 488 F.2d 619, and *Keker* v. *Procunier* (E.D.Cal. 1975) 398 F.Supp. 756), Jordan renews his contention below that denial of contact visits with his attorney violates his constitutional right to counsel (*Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d

---

[6]Section 2600 reads: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

Section 2601 reads, in pertinent part: "Notwithstanding any other provision of law, each such person shall have the following civil rights: ....."

"(d) To have personal visits; provided that the department may provide such restrictions as are necessary for the reasonable security of the institution."

[7]The department's response below also included the argument that Jordan had not exhausted his administrative remedies. Attorney Marshall's original declaration had alleged that no administrative remedies were adequate. The objection was not raised at the hearing in superior court, nor does the department raise it here.

818]; *People* v. *Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487]) which may not be restricted by prison officials in the absence of a showing of criminal complicity by counsel. While conceding Jordan's right to privately consult with his attorney (Cal. Admin. Code, tit. 15, § 3175; *In re Jordan* (1972) 7 Cal.3d 930, 941 [103 Cal.Rptr. 849, 500 P.2d 873]; *In re Qualls* (1943) 58 Cal.App.2d 330, 331 [136 P.2d 341]), petitioner argues in essence that: 1) the security risks reflected by the record justify the restriction on contact visits; 2) the substituted noncontact visits minimally intrude upon the attorney-client relationship and constitute the least restrictive means to promote the prison's legitimate goal of preventing the possibility of smuggled contraband during conventional attorney contact visits (*In re Bell* (1980) 110 Cal.App.3d 818 [168 Cal.Rptr. 100]; *In re French* (1980) 106 Cal. App.3d 74 [164 Cal.Rptr. 800]); further, 3) in the absence of any showing of impaired ability to prepare a defense, the necessity of proving attorney complicity, as contended by Jordan, is unduly burdensome and not constitutionally required.

The circumstances surrounding the termination of contact visits are illuminating:

On December 4, 1980, while Jordan was on his way to visit Ms. Marshall, his legal papers were subjected to routine search. A note was found taped to one of the pages of the papers carried by Jordan. The note read: "Otto-Frei, 13th and Webster, ask for jeweler's wire." At that time, apparently, Ms. Marshall had not yet been officially appointed as counsel in Jordan's assault case; however, she had visited him over the previous three to four years, often in a contact setting.

On February 3, 1981, Lieutenant Rohrer learned that Jordan was being allowed contact visits with Marshall. Lieutenant Rohrer did not indicate when he learned of the December 4, 1980, incident; however, on February 3, 1981, he submitted a written recommendation to Warden Sumner that Jordan's contact visits with Ms. Marshall be terminated on the basis of the December 4 incident, the fact that the then pending charges involved concealed weapons, and Jordan's disciplinary record. Warden Sumner agreed and terminated the contact visits.

(Ms. Marshall apparently had contact visits with Jordan between the Dec. 4, 1980, incident and the Feb. 1981 cutoff date.) In response to Judge Wilson's inquiry concerning why contact visits had not been ter-

minated sooner, the warden replied, "We have just tried to seal off this man's access to handcuff keys, hacksaw blades, weapons, weapon material, in every possible way. He continues to get them and he continues to assault people. . . . It's just a culmination."

The uncontroverted evidence of Jordan's history of violence and weapons possession in prison reflects a decade of incidents of attempted escape, assaults on staff and possession and use of weapons. Some of the weapons were prison made; others apparently were smuggled in from the outside. The search procedures normally used by the prison authorities apparently were ineffectual. Indeed, on one occasion, an X-ray scan detected weapons on Jordan which had not been previously disclosed by a metal detector; on another, Jordan concealed weapons in his rectum, including a five and one-fourth inch hacksaw blade. The exasperating degree of Jordan's custodial problems is underscored in the testimony of Warden Sumner: "in my career this record is the most serious that I have ever seen. I have been an advisor for the American Correctional Association for other prisons in the United States, and I was Chief Classification Services, and Assistant Chief Classification Services in Sacramento reviewing the files of the lockup inmates in the Department of Corrections, and his is the most serious."

After the termination of A-4 type contact visits, the prison authorities made special arrangements for a supervised contact visit between Jordan and Marshall so that the two could review Jordan's central file.[8] The warden testified he knew of no problems with this special trial-review visit (held on June 18, 1981) because Jordan was immediately X-rayed afterwards, although Jordan could not regularly be X-rayed after every visit for medical reasons.

Lieutenant Rohrer admitted under cross-examination that he had made public statements suggesting that prison guards (who are not subjected to metal detector scans) were smuggling weapons to prisoners.

Jordan presented no evidence which indicated in what manner the substituted noncontact visits adversely affected his relationship with his attorney.

### III.

The trial court based its order on the standard announced in *Adams* v. *Carlson, supra,* 488 F.2d 619; see also *Keker* v. *Procunier,*

---

[8]Jordan's original motion had included this request.

*supra*, 398 F.Supp. 756. Although such federal cases are entitled to great deference, they are neither binding upon California courts (*In re Whitehorn* (1969) 1 Cal.3d 504, 511, fn. 2 [82 Cal.Rptr. 609, 462 P.2d 361]; *Mullaney* v. *Woods* (1979) 97 Cal.App.3d 710, 719 [158 Cal. Rptr. 902]; *People* v. *Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307]), nor persuasive herein for the reasons we now state.

*Adams* involved a *blanket* denial of contact visits to *all* inmates in segregated confinement following disturbances at the prison and the discovery of gunpowder in an inmate's cell. Inmates were required to visit with their attorneys in a remarkably similar noncontact setting. The *Adams* court first observed that no "fundamental" interest was infringed by the partition arrangement requiring the government to show a compelling need for the restitution. (*Id., supra*, 488 F.2d 619, 631.) Instead, the court noted that "[w]hat is involved ... is a restriction on the ease with which attorney-client meetings *could* be carried on, and a lessening of personal interplay between inmates and counsel." (Italics in original.)[9]

In condemning the challenged restriction for lack of a prior showing of attorney complicity, the court noted that a less restrictive means had been available to prison officials, since the attorneys had offered to submit to a "search" prior to their visits. But, unlike the case at bench, there was no evidence of any particular inmate's history of weapons possession or prior violence. ■ Moreover, the United States Supreme Court has consistently upheld restrictions upon sentenced prisoners' rights grounded upon policy considerations of institutional security and internal order (*Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861]). ■ As the court observed at pages 545-548 [60 L.Ed.2d at pages 472-474]: "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and

[9]The *Adams* court noted, for example, that: "Documents and written communications cannot be passed directly from lawyer to inmate; a guard, materials in hand, must circumvent the outer perimeter of the room, often taking as long as five minutes. If the attorney chooses not to take this option, but nevertheless desires to discuss with his client the contents of one or more documents not then in the possession of the inmate, he must hold the document to the glass partition and refer to it from memory or from an extra copy as he speaks to his client over the phone. Contemporaneous discussion of two or more documents, or of a ponderous transcript, thus becomes a formidable undertaking. Equally formidable, it is argued, is an attempt by two or more attorneys to speak to one or more inmates, a particular problem in class action litigation of the sort now on appeal. Lastly, attorneys for appellants note the difficulty of establishing from behind glass a satisfactory working relationship with inmates who survive daily in an atmosphere charged with distrust." (*Id.*, at p. 630.)

rights, a retraction justified by the considerations underlying our penal system.' [Citations.] The fact of confinement as well as the legitimate goals and policies of the penal institution limits those retained constitutional rights. [Citation.] There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' . . . [Citations.] Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. [Citations.] [¶] Finally, . . . the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.]"

We think the restrictions placed upon Jordan were well within the permissible limits established by the United States Supreme Court. We are equally persuaded that the challenged restrictions neither violated nor unreasonably impinged Jordan's rights under the California Constitution in view of his demonstrated propensity towards violence and his status as a convicted prisoner subject to normal conditions of confinement. (See § 2600.) We emphasize that the uncontroverted facts of Jordan's prison history clearly established a sound basis for the necessary restrictions imposed (§ 2601, subd. (d));[10] *In re Bell, supra,* 110 Cal.App.3d 818).

Finally, while we recognize that such restrictions be the least onerous in view of the end to be achieved (*In re Bell, supra,* 110 Cal.App.3d 818; *In re French, supra,* 106 Cal.App.3d 74; *In re Carrafa* (1978) 77 Cal.App.3d 788 [143 Cal.Rptr. 848]), we believe that under the facts

---

[10]It is of no moment in our view that the restrictions were not imposed earlier than they were, because, as the warden explained, invoking them was a culmination—the result of a series of events.

and circumstances shown to exist, no reasonable alternative was available.[11]

We conclude that on the record presented, the termination of personal contact visits and substitution of the specified noncontact visits were reasonable and necessary in the interest of institutional security and public protection (§§ 2600-2601). However, since the trial has concluded, peremptory relief has become unnecessary and the alternative writ is accordingly discharged.

A petition for a rehearing was denied May 28, 1982.

---

[11]It is questionable at best whether potentially harmful repeated X-ray examinations or subjection of counsel to the indignity of a full strip-search would satisfy contemporary notions of reasonable alternatives.