[No. G017444. Fourth Dist., Div. Three. Sept. 10, 1996.]

In re ALAN FRANK ROARK on Habeas Corpus.

## COUNSEL

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Peter Siggins, Assistant Attorney General,

Darrell L. Lepkowsky and Timothy C. Foote, Deputy Attorneys General, for Respondent and Appellant.

Charles L. Lindner for Petitioner and Respondent.

## OPINION

WALLIN, J.—Alan Frank Roark and his attorney, Charles L. Lindner,[1] petitioned for a writ of habeas corpus, contending Roark had been unlawfully deprived of a contact visit with Lindner due to the Department of Corrections' improper requirement that Lindner remove and possibly disassemble his artificial leg as a condition for the visit. This court denied the petition,[2] and Roark sought review in the Supreme Court. By order of the Supreme Court, we issued an order to show cause, returnable before the Superior Court for Imperial County. That court granted the petition, and ordered the department to afford Lindner contact visits with Roark, subject to a close visual inspection of the leg while it is attached. The department appeals, contending it acted within its discretion by requiring removal and physical inspection of the leg. We affirm.

Roark retained Lindner to handle the appeal of his criminal case, and Lindner notified Centinela State Prison he wished to have a contact visit with Roark.[3] Francisco Jacquez of the prison staff told Lindner that to gain admission to the prison, Lindner would be required to remove his artificial leg and it would be subject to disassembly. Lindner told Jacquez the precision-made prosthetic leg cost $21,000, and he was not going to allow prison guards access to it.

---

[1]Lindner represents Roark on appeal in this court in the matter of *People* v. *Roark* (G015277, app. pending).

[2]Justice Sonenshine dissented.

[3]"Whether appellant's claim is reviewed on appeal or habeas corpus, the substantial evidence standard of review applies. This court must review the whole record in the light most favorable to the judgment or order below, and conflicts in the evidence must be resolved in favor of the [prevailing party]. [Citations.]" (*People* v. *Torres* (1990) 218 Cal.App.3d 700, 705 [267 Cal.Rptr. 213].) Thus, we reiterate the facts developed at the hearing on the order to show cause in a fashion most favorable to Roark, stating the facts as Lindner testified when they conflict with the department's witnesses. The trial court made no factual findings except that the department had no intent to discriminate against him because he was an attorney or because he was disabled. We honor those findings, although they are irrelevant to our conclusion.

The Attorney General cites the applicable standard on review, but in his statement of facts, makes no reference to Lindner's testimony at the hearing on the order to show cause, which differed in certain material aspects from the department's witnesses. Interestingly, the deputy attorney general at the hearing, the author of the Attorney General's brief, did not cross-examine Lindner at the hearing nor did he argue against Lindner's credibility.

Jacquez referred Lindner to the department's house counsel, Charles Sickels. Lindner called Sickels and told him he had never been subjected to a search that required him to remove his leg in 20 years as a criminal defense attorney. He explained he was subjected to metal detectors nearly every working day, and at most, had been subjected to being "wanded" and patted down. He added he was willing to "drop [his] drawers," as long as he was not required to remove the leg, because he understood the security concerns.[4] Sickels said he found that procedure satisfactory and would inform the prison officials Lindner would subject himself to a patdown, and would drop his drawers for a search by a same-sex official, if necessary.

Two days later, Lindner drove 240 miles to the prison. After a brief discussion about Lindner's attire,[5] officials told him he would not be admitted without taking off the leg.

Lindner grew angry and demanded they call the warden, Sickels, and Jacquez. His requests were refused and he was told to sit down and shut up. He complied, and Lieutenant Ernest Rojo appeared with a large deputy who toted a baton. Rojo ordered Lindner into an office, and Lindner's investigator was ordered to remain at a distance where he could not see into the office.

Rojo told Lindner that unless the leg came off, Lindner was not going in. Rojo did not offer to have Lindner go through the metal detector, be "wanded," or submit to an external search. Rojo ordered Lindner out of the office and ordered him to sign a form that said he was not going to visit that day.[6]

Lindner remained at the prison during visiting hours that day. He saw two visitors in wheelchairs and one on crutches. Neither the wheelchairs nor the crutches were inspected, nor were the people searched in any unusual manner.

In the ensuing months, Lindner had much correspondence and many telephone conversations with Jacquez. He filed a letter appeal with the

---

[4]Lindner had been a deputy city attorney with Los Angeles, a law clerk for the Yolo County District Attorney's Office, and had served as a special prosecutor a number of times.

[5]Lindner was wearing blue jeans which, as he acknowledges, are prohibited. He had forgotten about the rule. He was told there was a trailer where he could obtain appropriate clothing, but the issue soon became moot.

[6]The record does not reflect whether Lindner signed the form.

Director of Corrections, a complaint with the Attorney General's Office, and an action for violation of his rights under the Unruh Civil Rights Act as a disabled person.

About four months after the aborted visit, Lindner made an appointment for another visit because he "wanted to purify the issue" by appearing without an investigator and eliminating any objections to his clothing. He had previously requested a meeting to discuss Americans with Disabilities Act information he had sent to the prison, but when he arrived at the prison, none of the staff members with whom he was supposed to meet were available.

Lindner arrived at the prison visiting area at 2:50 p.m., and a search was conducted for almost two hours by Sergeant Linda Snead. She had Lindner walk through the metal detector and then empty his pockets twice. Lindner went to his car with the items Snead rejected, and returned to pass through the metal detector a second time. He was "wanded" a second time and sat in a chair to have the leg inspected. Lindner pulled his trouser leg up and a deputy inspected the leg for 15 to 20 minutes. In Snead's presence, the deputy took off the shoe and sock, felt the foot, and lifted the leg so he could see in the hollow calf of the leg. The deputy said he could not see anything, and Snead said she would admit him.

Lindner asked Snead whether she had any cause whatsoever to believe Lindner was carrying contraband, and she said she did not. Upon being asked to repeat the statement in front of other guards she said, "Yes, I am going to admit you on my own authority." When Lindner advised her she should tell her supervisors her findings, she made a telephone call. Rojo appeared five to ten minutes later and said, "He didn't clear the metal detector, don't let him in. He can have a noncontact visit."

Lindner was admitted for a noncontact visit. The interview took place through thick glass with telephones for communication. Unusual noises, static, and echoing were present on the phone lines. There was no slot through which any of the 2,500 pages of transcript or other documents might be passed. Lindner and Roark were able to communicate primarily by holding notes up to the glass, reading lips, and pantomime. Lindner was unable to discuss anything meaningful about the case with Roark, being essentially relegated to exchanging pleasantries.

At the hearing on the order to show cause, the department produced evidence relating to its security concerns. Centinela State Prison holds

maximum security, level IV inmates. Because there is a great problem with contraband entering prisons, including some instances at Centinela, strong measures must be taken to screen visitors.[7] Contraband, including parts of a gun, can be secreted inside a prosthetic leg, and smaller items, such as a knife, bullets, or gun parts, could be smuggled in the bucket part of the device.[8] Because the leg is partially made of metal, a metal detector is insufficient to search effectively; a further examination must be made.

 The department contends it acted within its discretion by demanding Lindner remove his prosthesis for a physical inspection as a condition for a contact visit. It reasons the demand was based on reasonable security concerns and the superior court should have deferred to its expertise on what measures were necessary to maintain security. The department also attacks the superior court's purported rejection of expert testimony and its determination probable cause was necessary to conduct a full body search. The claims lack merit.

Both Roark and the department acknowledge Penal Code sections 2600 and 2601,[9] dealing with prisoners' rights are implicated in this matter. Section 2600 reads in relevant part: "A person sentenced to imprisonment in a state prison may during that period of confinement be deprived of such rights, and only such rights, as is reasonably related to legitimate penological interests." Section 2601, subdivision (d) specifically affords prisoners the right "[t]o have personal visits. However, the department may provide any restrictions that are necessary for the reasonable security of the institution."

 "Reviewing a claim under section 2600 requires a three-step inquiry: (1) Are any 'rights' implicated? (2) If they are, does a 'reasonable security' problem exist which might permit a deprivation of rights under the statute? (3) If so, to what extent are deprivations of those rights 'necessary' to satisfy

---

[7]Witnesses related that at least four attorneys, a number of attorney investigators, and some disabled individuals had smuggled contraband into prisons. Although these instances were not at Centinela, two instances involved inmates smuggling contraband in a prosthetic leg.

[8]The expert, Kevin Calvo, admitted a person could, with appropriate positioning of the amputee, visually inspect the interior of the prosthetic calf, the area where he testified parts of a gun could be secreted. Concerning the bucket of the leg, into which the amputee's stump is inserted, Calvo opined that only a small, soft object, like a small bindle of drugs, or perhaps a small caliber cartridge or taped razor blade, could be hidden. He also indicated an item might be secreted in the shoe on the prosthetic foot if the shoe were large enough.

[9]All statutory references are to the Penal Code unless otherwise noted.

reasonable security interests." (*In re Arias* (1986) 42 Cal.3d 667, 689-690 [230 Cal.Rptr. 505, 725 P.2d 664].)[10] We use that format.

 Plainly, "rights" are implicated. Prisoners have a statutory right to visitation under section 2601, subdivision (d), and a constitutional right to effective assistance of counsel on appeal. (See *In re Smith* (1970) 3 Cal.3d 192, 198-203 [90 Cal.Rptr. 1, 474 P.2d 969] [right to effective assistance of appellate counsel].) Indeed, the department's regulations governing attorney visitation with inmates recognize this concept: "Inmates have a constitutional right to access to an attorney. It is the policy of this department to facilitate both correspondence and personal consultation for this purpose." (Cal. Code Regs., tit. 15, § 3175.) Attorney visitation includes the right to transfer papers, subject to reasonable inspection by the department in a manner that preserves confidentiality. (Cal. Code Regs., tit. 17, § 3175, subds. (j) & (*l*).)

The Attorney General asserts Roark's right to consult with his attorney was not impeded, that Lindner was afforded a noncontact visit. That argument implies Roark had no "right" to a contact visit. Indeed, the Attorney General goes so far as to argue, Roark had no right to more than access to a law library, citing federal authority. (See *Casey* v. *Lewis* (9th Cir. 1993) 4 F.3d 1516, 1522; *Toussaint* v. *McCarthy* (9th Cir. 1986) 801 F.2d 1080, 1109.) We need not decide whether those cases are correct.[11] We need only note those cases accept that rights are involved. (See, e.g., *Casey* v. *Lewis*,

---

[10]In enunciating the three-prong test, the *Arias* court distinguished the federal approach, which applies a different test than California. The federal courts use a "rational response" test, one which merely asks whether security measures are rationally related to a penal institution's security concerns. (See, e.g., *Bell* v. *Wolfish* (1979) 441 U.S. 520, 550 [60 L.Ed.2d 447, 475-476, 99 S.Ct. 1861].) Relying on the language in section 2600 that only permits "necessary" security measures to impinge on prisoners' rights, California courts require security measures that are the least intrusive possible, yet are flexible enough to satisfy the security need. (*In re Arias, supra,* 42 Cal.3d at pp. 690-691.) Due to this differing approach, federal authority is, for the most part, inapposite to our analysis.

[11]We note, however, that while law libraries might suffice for prisoners' general "access to the courts," they could hardly stand in the stead of the right to counsel on appeal. For example, in *In re Grimes* (1989) 208 Cal.App.3d 1175 [256 Cal.Rptr. 690], the court held prisoners were entitled to direct, noncollect telephone access to the public defender's office even though other means, such as mail were available. (*Id.* at pp. 1182-1183.) The court observed: "Inmates are guaranteed the right to adequate, effective and meaningful access to the courts under the Fourteenth Amendment. [Citations.] The right of access to counsel is an essential component of the right of access to the courts. [Citations.] [T]his right of access requires that inmates be given a 'reasonable opportunity to seek and receive the assistance of attorneys,' and '[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.' [Citations.] This right is possessed not only by convicted prisoners, but by pretrial detainees who are jailed pending trial. [Citations.]" (*Id.* at p. 1182.)

*supra*, 4 F.3d at p. 1520.) Indeed, the Ninth Circuit has held the right of access to the courts includes visits with an attorney. (*Ching* v. *Lewis* (9th Cir. 1990) 895 F.2d 608, 610.) Roark's unrebutted allegations and Lindner's unrebutted testimony established the noncontact visit afforded Lindner substantially impeded his ability to adequately confer with Roark regarding the appeal.

California cases are in accord, having subjected the denial or restriction of contact visits to judicial scrutiny, in cases involving attorney and nonattorney visitors. (*People* v. *Torres, supra,* 218 Cal.App.3d at p. 705 [right to confer with counsel in absolute privacy]; *Department of Corrections* v. *Superior Court* (1982) 131 Cal.App.3d 245, 250-252 [182 Cal.Rptr. 294] [evaluating denial of attorney contact visitation]; *In re Stone* (1982) 130 Cal.App.3d 922, 928-930 [182 Cal.Rptr. 79] [right to contact visit by nonattorney after strip search]; *In re Bell* (1980) 110 Cal.App.3d 818, 822 [168 Cal.Rptr. 100] [nonattorney contact visits could be restricted because no less restrictive security measures were available]; *In re French* (1980) 106 Cal.App.3d 74, 84 [164 Cal.Rptr. 800] [nonattorney contact visits could not be restricted after strip search]; and see *Adams* v. *Carlson* (7th Cir. 1973) 488 F.2d 619, 631 ["What is involved . . . is a restriction on the ease with which attorney-client meetings could be carried on, and a lessening of personal interplay between inmates and counsel."].) In reaching its conclusion contact visits had been improperly restricted, the court in *In re French, supra,* 106 Cal.App.3d 74 noted, "Contact visits are deemed to be a critical part of correctional policy in California. Thus, the Director of the Department of Corrections has promulgated the following rule: 'Devices which preclude physical contact between inmates and visitors will not be used except as is necessary in individual instances where substantial reasons exist to believe that physical contact with a visitor, visitors or with other inmates will seriously endanger the safety of persons or the security of the institution, or as a temporary measure as punishment for willful failure or refusal to abide by regulations related to visiting.' (Cal. Admin. Code, tit. 15, § 3170, subd. (d); see also §§ 3173, subd. (h) and 3173, subd. (p).)" (*In re French, supra,* 106 Cal.App.3d at p. 85, fn. omitted.)[12]

Having established the right to contact visitation is involved, we inquire whether "a 'reasonable security' problem exist[s] which might permit a deprivation of rights under [section 2600]." (*In re Arias, supra,* 42 Cal.3d at

---

[12]The United States Supreme Court has held prisoners have no independent constitutional right to social visits, but states may create interests in such visits that are protected by due process considerations. (*Kentucky Dept. of Corrections* v. *Thompson* (1989) 490 U.S. 454, 460-463 [104 L.Ed.2d 506, 514-517, 109 S.Ct. 1904].)

p. 689.) Undoubtedly so. Case law and the evidence in this case verify a substantial risk of contraband, primarily drugs and weapons, being smuggled into prison by visitors. (See *Bell* v. *Wolfish, supra,* 441 U.S. 520, 545-548 [60 L.Ed.2d 447, 472-475]; *Pell* v. *Procunier* (1974) 417 U.S. 817, 823 [41 L.Ed.2d 495, 502, 94 S.Ct. 2800] ["[C]entral to all other corrections goals is the institutional consideration of internal security"]; *Estes* v. *Rowland* (1993) 14 Cal.App.4th 508, 538-539 [17 Cal.Rptr.2d 901] [smuggling of contraband is a "grave problem"]; *Department of Corrections* v. *Superior Court, supra,* 131 Cal.App.3d at pp. 253-254 [potential for escape].)[13]

Giving due heed to the security problem and the need for deference by the courts (*Bell* v. *Wolfish, supra,* 441 U.S. at pp. 545-548 [60 L.Ed.2d at pp. 472-475]),[14] we turn to the third prong of the *Arias* test, whether requiring Lindner to remove his $21,000 prosthesis, and potentially subjecting it to disassembly, as the price for a contact visit was "necessary." (*In re Arias,*

---

[13]The Supreme Court in *Bell* v. *Wolfish, supra,* 441 U.S. 520, explained the policy considerations of institutional security and the need for deference by the courts: " 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' [Citations.] The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. [Citation.] There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' [Citation.] . . . [¶] . . . Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. [Citations.] [¶] Finally, . . . the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. [Citations.] 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' [Citation.]" (*Bell* v. *Wolfish, supra,* 441 U.S. at pp. 545-548 [60 L.Ed.2d at pp. 473-474], fn. omitted.)

We must note, however, that from the evidence at the hearing below, the risk an attorney might sneak contraband in a prosthetic leg appears virtually nil. A former warden testified he only knew of a few attorneys trying to smuggle contraband into prisons in his many years in the system. He knew of an investigator who carried a cane with drug residue inside the removable head. A prosthetics expert testified he heard of *an inmate* smuggling drugs in a prosthetic leg. We view the contraband smuggling impact on prison security in the abstract, however. We consider the probability as to any given visitor as it relates to the next prong of the test.

[14]While we fully acknowledge the problem, we do not do so based on the Attorney General's reference to *Spain* v. *Rushen* (9th Cir. 1989) 883 F.2d 712, which chronicled the infamous George Jackson prison break of 1971. Although the attempted escape with guns followed an attorney visit, the attorney was acquitted of all charges, as Roark notes.

*supra*, 42 Cal.3d at p. 691.) In other words, we inquire whether that security measure was "the least intrusive possible of [Roark's] rights yet flexible enough to satisfy the security need." (*Ibid.*)

To determine whether the department's demands were permissible, we must categorize the nature of the intrusion. That task is made somewhat difficult by the dearth of amputee search cases. Nevertheless, the intrusion must be as substantial as a strip search. The embarrassment and potential degradation of disrobing and exposing a deformity to others is unquestionable. Moreover, the process of removing the leg and replacing it away from home is cumbersome, taking up to a half hour, and heightens the risk of pain, chafing, lacerations and infection. And, Lindner expressed concern about untrained prison staff damaging his $21,000 precision instrument if it were disassembled.

■ " '[T]he Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions.' [Citation.] 'To justify a strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience.' [Citation.]" (*Estes* v. *Rowland, supra*, 14 Cal.App.4th 508, 532, fn. omitted; compare with Cal. Dept. of Corrections Operations Manual, § 54020.9.4, p. 54020-19 [probable cause for body cavity search required].)[15]

■ The department points to a number of cases, and we have found others, where strip searches have been approved as a condition of visitation. But what the department fails to recognize is that in all of these cases, prison officials had more reason for suspicion than the presence of the visitor and the abstract possibility the person might be carrying contraband. (See, e.g., *Estes* v. *Rowland, supra*, 14 Cal.App.4th at p. 532 [trained dogs had alerted to drugs]; *People* v. *Torres, supra*, 218 Cal.App.3d at pp. 707-708 [information inmate was plotting escape and attorney was implicated]; *In re Stone, supra*, 130 Cal.App.3d at p. 924 [specific visitors had been suspected of smuggling drugs]; *In re Bell, supra*, 110 Cal.App.3d at p. 820 [inmates found with drugs after visit]; *In re French, supra*, 106 Cal.App.3d at p. 77

---

[15]The Attorney General complains the trial court improperly used a probable cause standard. He is correct, but it does not affect our analysis. Because we find there was no rational suspicion for a further search, we will uphold the trial court's ruling even though its reasoning was somewhat flawed. A reviewing court will affirm a judgment if it is "correct for any reason, 'regardless of the correctness of the grounds upon which the [trial] court reached its conclusion.' [Citation.]" (*United Pacific Ins. Co.* v. *Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 933 [266 Cal.Rptr. 231]; see also *People* v. *Gibson* (1987) 195 Cal.App.3d 841, 853 [241 Cal.Rptr. 126].)

[confidential information visitors were smuggling drugs]; *Department of Corrections* v. *Superior Court, supra,* 131 Cal.App.3d 245, 253-254 [defendant, with substantial history of assault and attempted escape, found bringing note to attorney meeting asking for "jeweler's wire"].) All of the searches were supported by specific articulable facts pointing directly to the persons to be searched. (*Estes* v. *Rowland, supra,* 14 Cal.App.4th 508, 532.)

The department points to Lindner's purported refusal to submit to a search and the positive alert from the metal detector. The record belies the first ground. Lindner testified he only refused to take off the leg during the first visit. He went to great lengths to contact Sickels ahead of time and expressed a willingness to "drop his drawers" if necessary. On the second occasion, he submitted to a two-hour search, including passing through the metal detector, being "wanded," and submitting to an extensive examination of the leg. Sergeant Snead was satisfied Lindner was carrying no contraband and would have let him in had she not been overruled by Rojo. The only search Lindner refused was removing his leg and submitting it to dismantling, something we find he was not required to do.

True, Lindner set off the metal detector. At that point it was reasonable for the authorities to conduct a further investigation to examine the source of the metal.[16] They did, and a thorough visual examination yielded no cause for suspicion. The department put on extensive testimony from a former warden and a prosthetic leg expert about all of the ways a person might smuggle contraband in a prosthetic leg.[17] But the department failed to show any particularized suspicion Lindner was doing so. After he had gone through the scrutiny of an extensive search with the leg on, the chances he was sneaking contraband into the prison were no greater than any other visitor.[18]

Under these circumstances, the search of the leg was sufficient to protect the reasonable security interests of the prison. Although we show great deference to the security judgments of the department, the courts cannot abdicate their responsibility to protect inmates' rights to adequate contact with their attorneys and to disapprove of visitation requirements that place a

---

[16]We say that in the abstract. Of course, the officials already knew it was an artificial leg. But they had a right in any event to a further reasonable inspection.

[17]For all the testimony that was had, the only credible suggestions regarding what contraband Lindner *might* have gotten into the prison were a small bindle of drugs, or a taped razor blade, or a small caliber bullet, assuming he could stand the pain inherent in stuffing them in the bucket of the leg.

[18]For example, an individual with no metal on his or her person would not set off the metal detector and would not be subject to a further search. That person could sneak a bindle of drugs into the prison undetected.

chilling effect on attorney visitation, especially when the security risk in a given case is ephemeral.[19] "[T]he deference to which prison administrators are ordinarily entitled has never been construed as requiring judicial abstention . . . ." (*In re Parker* (1984) 151 Cal.App.3d 583, 590 [198 Cal.Rptr. 796].)[20]

The order granting the writ of habeas corpus is affirmed.

Sills, P. J., and Sonenshine, J., concurred.

---

[19]In making this pronouncement, we stress our ruling is limited, as it should be, to the facts of this case. We do not state any blanket rule pertaining to attorneys or amputees or amputee attorneys, in general. Nor do we suggest what might constitute cause for more intrusive measures in another situation. We stress, however, that by our ruling we do not hold an amputee can be ordered to physically remove clothing (i.e., drop one's drawers) as a prerequisite to visitation. As noted, strip searches require particularized suspicion, and the mere presence of an artificial limb does not provide it. The trial court's order regarding disrobing was clearly a product of Lindner's offer to do so, and Lindner does not challenge it.

[20]Because we affirm the order for reasons we have stated, we need not address any equal protection claims.